Trustees of Health & Hospitals of Boston, Inc. *v.* Massachusetts Commn. Against Discrimination.

TRUSTEES OF HEALTH AND HOSPITALS OF THE CITY OF
BOSTON, INC. *vs.* MASSACHUSETTS COMMISSION AGAINST
DISCRIMINATION & others.[1]

No. 04-P-1036.

Suffolk. May 13, 2005. - December 23, 2005.

Present: LAURENCE, DUFFLY, & KATZMANN, JJ.

Further appellate review granted, 447 Mass. 1104 (2006).

*Administrative Law,* Judicial review, Agency's interpretation of statute, Substantial evidence. *Anti-Discrimination Law,* Termination of employment, Prima facie case, Burden of proof. *Employment,* Discrimination, Termination. *Damages,* Interest. *Interest. Governmental Immunity.*

The complainants in an employment discrimination action offered sufficient evidence to establish a prima facie case of discrimination based on race and sex, where, in addition to showing that they were members of a protected class; that the manner in which they were laid off constituted terms, conditions, or privileges of employment; and that they had performed acceptably, the complainants proved that they were treated worse by their employer than all potential comparators. [333-336]
This court concluded that in an employment discrimination action, the Massachusetts Commission Against Discrimination may award prejudgment interest against the Commonwealth under G. L. c. 151B. [336-339]

CIVIL ACTION commenced in the Superior Court Department on June 19, 2002.

The case was heard by *Thomas E. Connolly,* J., on motions for judgment on the pleadings.

*Steven Locke* for Massachusetts Commission Against Discrimination.

*Kelly M. Bonnevie* (*Marc L. Breakstone* with her) for Veronica Higginbottom & others.

*Christine M. Hayes* for the plaintiff.

KATZMANN, J. Five female, African-American employees

---

[1]Gloria Coney, Belinda Chambers, Veronica Higginbottom, Marlene Hinds, and Betty Smith.

(complainants) of the Trustees of Health and Hospitals of the City of Boston, Inc. (THH), filed an employment discrimination claim with the Massachusetts Commission Against Discrimination (MCAD), alleging that they were subjected to differential treatment during their terminations as part of an organized layoff, in violation of G. L. c. 151B, § 4. The hearing officer and the MCAD found that THH discriminated against the complainants because of their race and sex and awarded damages for emotional distress. A Superior Court judge vacated the award, concluding that the MCAD had applied an improper legal standard, and granted THH's motion for judgment on the pleadings. The complainants appeal from that ruling. They also appeal from the MCAD's decision to vacate the hearing officer's award of prejudgment interest against THH. We conclude that the hearing officer and the MCAD were correct in determining that the complainants had suffered discrimination, and were entitled to damages for emotional distress. We thus reverse the Superior Court judge's decision, and we reinstate the MCAD's order on those claims. Additionally, we reinstate the hearing officer's award of prejudgment interest to the complainants.

*Facts.* We relate the relevant facts as found by the hearing officer. In July, 1994, in response to funding cutbacks, THH laid off five African-American women — Gloria Coney, Belinda Chambers, Veronica Higginbottom, Marlene Hinds, and Betty Smith — from its Healthy Baby/Healthy Child Program. Each of these women was a full-time employee at THH's Hyde Park office. At least one of them was a management-level employee.

During these same layoffs, THH also laid off Christopher Navin, a Caucasian man who worked in the Healthy Baby/ Healthy Child Program at the Hyde Park location, as well as at a Boston location, and at times, from his home. He was a permanent part-time employee who was responsible for reviewing and making recommendations concerning the Healthy Baby/ Healthy Child Program's organizational structure. Navin's layoff and the layoffs of the complainants were strikingly different in their execution.

Marjorie Perkins, the program director of the Healthy Baby/ Healthy Child Program, was in charge of the layoffs. She learned on or before June 30, 1994, that there would have to be

layoffs in the program. After Perkins chose the employees who were going to be laid off, she requested assistance from THH's management in carrying out the layoffs. The director of labor relations, Teri McNamara, was sent to assist her. On numerous occasions, Perkins and McNamara discussed the manner in which the layoffs were to be conducted.

Coney and Hinds were laid off on July 19, 1994, when Perkins and McNamara called them into Perkins's office and informed them that they were being laid off effective immediately, and that they should collect their belongings and leave within thirty minutes. In full view of their coworkers and Hinds's daughters (who happened to be at the office), McNamara and two other employees monitored Coney and Hinds as they packed their things. The monitoring was such that Hinds's daughters thought their mother was being observed to prevent stealing. Perkins and one of the employees examined Coney's belongings as she packed, including an inspection of her lunch bag. She was told that the monitoring was to ensure she did not take anything issued by THH. Coney refrained from using the restroom because she felt she would be watched. She asked for special permission to return the following day to collect the rest of her things. She was allowed to do so, again under the supervision of an employee. Coney did not have an opportunity to say goodbye to her coworkers, some of whom cried and asked if she was being arrested.

Higginbottom, Chambers, and Smith were not at work on July 19. On July 20, they were summoned to Perkins's office, informed that they were being laid off effective immediately, and sent to pack their belongings. They were monitored in a fashion similar to the scrutiny Hinds and Coney had endured. Notably, Smith did not have an opportunity to collect all her belongings and left photographs and certificates in the office. In addition, McNamara pulled papers out of Chambers's hands as Chambers packed and "order[ed] Chambers around." Chambers's officemate cried as Chambers packed. McNamara also refused to allow Chambers to contact her clients to tell them she would not make her appointments that day. Finally, after several requests, McNamara permitted Chambers to take the telephone numbers of some of her clients home to contact them later.

Trustees of Health & Hospitals of Boston, Inc. v. Massachusetts Commn. Against Discrimination.

These layoff procedures stand in stark contrast to the treatment Navin received upon his termination. Navin was given a month's advance notice of his layoff. He was allowed to come to the office at his convenience to receive his termination notice. After being told that a particular employee whom he knew from another job was to give him his notice, he requested that it be a different employee, and his request was granted. Navin was not monitored as he cleaned out his desk and he was permitted to walk around the building freely to say goodbye to his coworkers. A week later, he returned to the office, but was asked to leave because there had been allegations of discrimination concerning the layoffs.

Within two weeks following the layoffs, THH Commissioner Lawrence Dwyer apologized to the complainants at a union meeting, stating that the treatment they received would not be repeated during his tenure. Dwyer also offered Chambers and Higginbottom another job. They rejected this offer. The complainants thereafter filed their complaint with the MCAD. Their theory of liability was not that THH discriminated in its choice of whom to lay off, but rather in the manner in which it executed the layoff.

At the hearing, McNamara testified that she and Perkins had decided on the layoff procedures because they were concerned for their safety and to prevent vandalism and theft at the office, especially with regard to confidential patient files. The hearing officer concluded that these reasons were merely a pretext for THH's actions.[2] He found that the complainants suffered emotional harm as victims of discrimination, and awarded them

[2]In refusing to credit McNamara's testimony, the hearing officer noted that McNamara's testimony concerning the basis of the procedures conflicted with Perkins's testimony — the person with whom McNamara supposedly decided on the procedures — and conflicted with McNamara's own deposition testimony. In addition, the hearing officer pointed out that McNamara's testimony was undercut by the fact that THH failed to take simple steps during the layoff to protect the integrity of patient files, such as identifying which of the complainants had patient files in their possession, or even telling the complainants that the layoff procedures were intended to protect patient files. Some of the complainants did not handle confidential patient files as part of their employment.

damages based on these injuries.[3] The MCAD affirmed this award. THH subsequently appealed the decision to the Superior Court via G. L. c. 30A; THH's motion for judgment on the pleadings was allowed.

*Standard of review.* We generally review an agency's interpretation of law de novo. See, e.g., *Hogan* v. *Labor Relations Commn.*, 430 Mass. 611, 613 (2000). However, we grant deference to the interpretations administrative agencies make of the statutory scheme that they administer. *Somerset Importers, Ltd.* v. *Alcoholic Beverages Control Commn.*, 28 Mass. App. Ct. 381, 385 (1990). See *Heublein, Inc.* v. *Capital Distrib. Co.*, 434 Mass. 698, 705 (2001). Further, "[w]e will affirm a decision and order of the MCAD unless the findings and conclusions are unsupported by substantial evidence or based on an error of law." *Salem* v. *Massachusetts Commn. Against Discrimination*, 44 Mass. App. Ct. 627, 640-641 (1998).

*Discrimination claims under G. L. c. 151B.* The complainants' discrimination claims are based on alleged violations of G. L. c. 151B, § 4, as amended by St. 1965, c. 397, § 4, which, in relevant part, makes it unlawful "[f]or an employer, by himself or his agent, because of the race [or] sex . . . of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification." Specifically, the complainants assert that THH discriminated against them in the "terms, conditions or privileges of employment" by its degrading differential treatment of them during their layoffs, which they claim was due to the fact that they are African-American women.

Claims of discrimination under G. L. c. 151B are usually evaluated using a three-stage test.[4] See *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 440-441 (1995) (*Blare*).

[3]Coney was awarded $30,000. Hinds was awarded $20,000, and Chambers, Higginbottom, and Smith were each awarded $25,000.

[4]The three-stage test announced in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973), and adopted by the Supreme Judicial Court, is technically only a substitute for direct evidence of discrimination, allowing a "jury to infer discriminatory animus and causation from proof that an employer has advanced a false reason for the adverse employment decision." *Sullivan* v.

Applying this test, the hearing officer found in favor of the complainants and the MCAD affirmed the decision. The Superior Court judge, however, concluded that the MCAD erred in the application of the first stage of this test. To survive this first stage, the complainants were required to establish a prima facie case of discrimination by a preponderance of the evidence. *Blare*, 419 Mass. at 441. See *Wynn & Wynn, P.C.* v. *Massachusetts Commn. Against Discrimination*, 431 Mass. 655, 665 n.22 (2000) (discriminatory failure to hire); *Knight* v. *Avon Prods., Inc.*, 438 Mass. 413, 420-421 (2003) (discriminatory termination). The specific elements of the first stage are flexible and may be altered to fit the factual needs of the kind of discrimination allegedly at work in a given case. See *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. 34, 41-45 (2005). In the circumstances of this case, the elements we consider are (1) whether they were members of a protected class; (2) whether they suffered an adverse action with respect to a term, condition, or privilege of employment; (3) whether they had performed acceptably in connection with the aspect of employment in which the adverse action was taken; and (4) whether they were treated less favorably with respect to that adverse action than similarly situated coworkers who were not members of the protected class. On appeal to the Superior Court, the question was whether the MCAD had properly applied the fourth element. It was undisputed that the complainants had shown that they were members of a protected class, that the manner in which they were laid off constituted terms, conditions, or privileges of employment,[5] and that they had performed acceptably.

---

*Liberty Mut. Ins. Co.*, 444 Mass. 34, 40 (2005). We use this test frequently due to the lack of direct evidence of illegal discrimination that afflicts most antidiscrimination lawsuits. See *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 445 (1995), citing *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 137 (1976). However, its use is not mandatory, and there are rare cases in which a plaintiff can directly prove the four basic elements of G. L. c. 151B — membership in a protected class, harm, discriminatory animus, and causation — without resort to this test. See *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. at 39.

[5]See *Randlett* v. *Shalala*, 118 F.3d 857, 862 (1st Cir. 1997) (" 'terms, conditions, or privileges' is pretty open-ended language . . . and a number of cases have extended coverage to slights or indignities that might seem evanescent").

Applying the fourth element, the MCAD affirmed the hearing officer's conclusion that the complainants were treated less favorably than Navin, a similarly situated, Caucasian, coworker. The Superior Court judge disagreed with this analysis. While noting that he empathized with the complainants and "that the manner in which they were laid off was unfair," the judge concluded that the MCAD had failed to identify the appropriate relevant factors in determining that Navin was similarly situated to the complainants.

In our view, it is unnecessary to decide whether Navin was similarly situated in all relevant ways to the complainants, because regardless whether Navin was similarly situated, the record reflects that the complainants were treated worse than all potential comparators. This was enough of a showing to meet the complainants' burden. Although providing a similarly situated comparator is usually the most probative means of proving that an adverse action was taken for discriminatory reasons, it is not absolutely necessary.[6] See *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129 (1997). See also *Lavalley* v. *Quebecor World Book Servs. LLC*, 315 F. Supp. 2d 136, 148 n.10 (D. Mass. 2004) ("Massachusetts courts do not appear to ever have squarely said that [comparator] evidence is *required*" [emphasis added]). Other types of evidence that might be used to prove a prima facie claim of discrimination include statistical evidence concerning the treatment of different classes of employees. See *Smith College* v. *Massachusetts Commn. Against Discrimination*, 376 Mass. 221, 228 n.9 (1978).

In this case, the hearing officer found that there was no evidence that "anything similar had ever happened before in complainants' workplace," and that McNamara and Perkins had had several conversations on the manner in which to conduct these particular layoffs. At oral argument, the attorney for THH confirmed that the manner in which the complainants were laid

---

[6]While we need not resolve whether the MCAD used the appropriate criteria in evaluating whether Navin was similarly situated in all relevant ways to the complainants, we note that the MCAD's factors in that regard accomplished the goal of the stage-one burden, namely, to eliminate potential, legitimate, nondiscriminatory reasons.

off was unique.[7] These facts support an inference that the complainants were intentionally treated differently from every other employee laid off for budgetary reasons. Intentional negative treatment of several employees in the same protected class is evidence of discrimination. See *Knight* v. *Avon Products,* 438 Mass. at 426 n.9. Moreover, a deviation from past practice is also evidence of discrimination. See *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.),* 427 Mass. 1, 17 (1998). Taken together, this evidence is enough to meet the complainants' burden under the fourth element.

The complainants have proved not simply that they were treated worse than one similarly situated comparator, they have proved that they were treated worse than all potential comparators. This showing fulfils the purpose of the stage one showing: to "eliminate[] the most common nondiscriminatory reasons for the plaintiff's rejection." See *Blare,* 419 Mass. at 441, quoting from *Texas Dept. of Community Affairs* v. *Burdine,* 450 U.S. 248, 254 (1981). See also *Sullivan* v. *Liberty Mut. Ins. Co.,* 444 Mass. at 45, quoting from *Che* v. *Massachusetts Bay Transp. Authy.,* 342 F.3d 31, 38 (1st Cir. 2003) (stating that stage one is meant only to be a " 'small showing' that is 'easily made' ").[8] In sum, the complainants offered sufficient evidence to establish a prima facie case of discrimination.

*Application of statutory interest.* Finally, the complainants

---

[7]The attorney for THH acknowledged that typically, THH employees laid off for financial reasons were not treated the way the complainants were.

[8]In addition, as we discussed at note 4, *supra,* the entire three-stage test is merely a method for using circumstantial evidence to prove that an adverse employment action was taken for improper, discriminatory, reasons. See *Sullivan,* 444 Mass. at 39-40. In the rare case where an employee can provide direct evidence of improper discriminatory animus, the test in *McDonnell Douglas Corp.* v. *Green, supra,* is not used. See *Gates* v. *Flood,* 57 Mass. App. Ct. 739, 743-744 (2003). See also *Wynn & Wynn, P.C.* v. *Massachusetts Commn. Against Discrimination,* 431 Mass. at 665, citing *Johansen* v. *NCR Comten, Inc.,* 30 Mass. App. Ct. 294, 298 (1991). Instead, the employee uses direct evidence to prove that the employer intentionally discriminated against her and that the discriminatory animus is the "but for" cause of the adverse action. See *Gates,* 57 Mass. App. Ct. at 744. See also Moriearty, Adkins, Rubin & Jackson, Employment Law § 8.42, at 536 (2d ed. 2003), and cases cited. Consequently, the complainants' evidence might have been sufficient to show discrimination even outside of the three-stage test used by both the MCAD and the Superior Court.

ask us to reverse the MCAD's order vacating the hearing officer's award of prejudgment interest. The MCAD initially denied the complainants prejudgment interest because it concluded that it was required to do so based upon two cases decided by this court, which hold that such interest is barred by sovereign immunity. See *Boston* v. *Massachusetts Commn. Against Discrimination*, 39 Mass. App. Ct. 234, 245 (1995) (*Boston*); *Salem* v. *Massachusetts Commn. Against Discrimination*, 44 Mass. App. Ct. 627, 646-647 (1998) (*Salem*). See also *Dalrymple* v. *Winthrop*, 50 Mass. App. Ct. 611, 621-622 (2000). The MCAD has since rejected this position and now concurs with the complainant that prejudgment interest should have been awarded. We are persuaded by the MCAD's and the complainants' argument that subsequent opinions of the Supreme Judicial Court make it appropriate that we revisit the reasoning supporting the parts of the *Boston* and *Salem* cases that discussed prejudgment interest. Accordingly, we now hold that prejudgment interest may properly be awarded against the Commonwealth by the MCAD under G. L. c. 151B.[9]

Both the *Boston* and the *Salem* cases rely on the principle that the Commonwealth does not waive sovereign immunity unless there is "express statutory authorization."[10] See *Boston*, 39 Mass. App. Ct. at 245; *Salem*, 44 Mass. App. Ct. at 646. In *Bain* v. *Springfield*, 424 Mass. 758, 763 (1997), quoting from *C & M Constr. Co.* v. *Commonwealth*, 396 Mass. 390, 392 (1985), however, the Supreme Judicial Court clarified this principle,

---

[9]The complainants also argue that *Clifton* v. *Massachusetts Bay Transp. Authy.*, 62 Mass. App. Ct. 164 (2004), *S.C.*, 445 Mass. 611 (2005), controls this issue because it stands for the proposition that quasi public agencies like THH do not enjoy the protection of sovereign immunity. Because we rule in the complainants' favor on their other argument, we need not consider this question. However, in passing, we make two observations: first, in *Clifton*, this court concluded that the Massachusetts Bay Transportation Agency (MBTA) was not shielded by sovereign immunity because of the scope of tort liability as defined in a statute, G. L. c. 161A, § 38, not because it was quasi public, *Clifton* v. *Massachusetts Bay Transp. Authy.*, 62 Mass. App. Ct. at 178; second, THH is not the same type of quasi public agency as the MBTA and the Massachusetts Turnpike Authority for the purposes of the Massachusetts Tort Claims Act. See *Johnson* v. *Trustees of Health & Hosps. of Boston*, 23 Mass. App. Ct. 933, 934-935 (1986).

[10]In *Dalrymple* v. *Winthrop*, 50 Mass. App. Ct. at 622, the court simply referred to *Boston* without discussion.

stating, "immunity is still in effect unless consent to suit has been 'expressed by the terms of a statute, or appears by necessary implication from them.' "

Recognition that sovereign immunity may be waived by necessary implication is both important and relevant to the interpretation of G. L. c. 151B. The *Bain* court reasoned that sovereign immunity had been waived under c. 151B for punitive damages because the statute expressly authorizes punitive damages as a remedy, and because the Commonwealth and its subdivisions are specifically listed in the statutory definition of persons and employers subject to the statute. See *Bain* v. *Springfield*, 427 Mass. at 762-764. Therefore, the natural and ordinary reading of the statute resulted in a necessary implication that the Commonwealth had consented to punitive damages pursuant to the statute. See *id.* at 763. In other words, if a remedy is authorized by statute, and if it would apply to the Commonwealth by virtue of the appropriate statutory definition, sovereign immunity is waived.

The reasoning of the *Bain* court is applicable to the case at hand. First, the Commonwealth and its subdivisions are listed under the statutory definition of persons and employers subject to G. L. c. 151B, as the *Bain* court recognized. Second, prejudgment interest is a remedy authorized under c. 151B. See *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. 156, 169-170 (1987); *New York & Mass. Motor Servs., Inc.* v. *Massachusetts Commn. Against Discrimination*, 401 Mass. 566, 583 (1988). Therefore, the award of prejudgment interest in this case is no different from the award of punitive damages in *Bain*.

Although the statutory authorization for prejudgment interest is not explicit in our case — as the authorization for punitive damages was in *Bain* — the Supreme Judicial Court has made clear that prejudgment interest is permitted under the broad grant of authority to the MCAD under G. L. c. 151B, § 4. See *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. at 169-170; *New York & Massachusetts Motor Servs., Inc.* v. *Massachusetts Commn. Against Discrimination*, 401 Mass. at 583. More importantly, the court has held that broad authorization for prejudgment interest is specific enough to constitute a waiver of sovereign

immunity under the relatively similar statutory scheme of G. L. c. 150E.[11] See *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. 557, 579-580 (1983). See also *Conway* v. *Electro Switch Corp.*, 825 F.2d 593, 601 (1st Cir. 1987) (noting that c. 150E is "virtually identical" to c. 151B with regard to the scope of its remedial provision).

In light of the reasoning suggested in *Bain* v. *Springfield*, *supra*, and *School Comm. of Newton* v. *Labor Relations Commn.*, *supra*, we conclude that the MCAD's current position is the correct one and that prejudgment interest can be awarded against the Commonwealth under G. L. c. 151B.[12]

*Conclusion.* We reverse the judgment of the Superior Court, and order the entry of a new judgment that modifies the MCAD's decision by reinstating the hearing officer's award of prejudgment interest. The new judgment shall affirm the MCAD's decision, as so modified.

*So ordered.*

---

[11]General Laws c. 150E is the statutory scheme that, among other things, authorizes the Labor Relations Commission to remedy unfair labor practices.

[12]To the extent that the *Boston* and *Salem* cases held that the grant of authority to the MCAD under G. L. c. 151B is not specific enough to waive the sovereign immunity of the Commonwealth for the purposes of ordering prejudgment interest, they are not controlling post-*Bain*. We note that in a recent decision, *Brookfield* v. *Labor Relations Commn.*, 443 Mass. 315, 326 (2005), a case focusing on G. L. c. 150E, the Supreme Judicial Court ruled that although there was no express statutory authorization for an award of interest, such an award was a "necessary remedial component of the statute." In passing, in a footnote, the court declined to invoke *Boston* and *Salem* as persuasive authority in support of the contrary view. *Id.* at 326 n.5. The question of the waiver of sovereign immunity under G. L. c. 151B was not before the court. While the court stated that "the Appeals Court's decisions in [*Salem* and *Boston*] have no relevance here because those cases dealt with interest awards made pursuant to G. L. c. 151B," *ibid.*, we do not understand that language to suggest anything more than that the reference to G. L. c. 151B was not necessary to the decision before the court.